IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

MICHAEL BOLLWITT AND JERI BOLLWITT                                PLAINTIFFS

V.                                                CIVIL ACTION NO. 1:20-CV-112-SA-DAS

BAPTIST MEMORIAL HOSPITAL-GOLDEN
TRIANGLE, INC. D/B/A BAPTIST MEMORIAL
HOSPITAL-GOLDEN TRIANGLE, *et al*.                                DEFENDANTS

ORDER

Now before the Court is the Plaintiffs, Michael and Jeri Bollwitt's, Motion for Partial Summary Judgment [186]. The Motion [186] has been fully briefed. Having reviewed the filings, as well as the applicable authorities, the Court is prepared to rule.

*Relevant Background*

This civil action arises from medical treatment Michael Bollwitt received at the emergency room of Baptist Memorial Hospital – Golden Triangle (hereinafter "Baptist") in Columbus, Mississippi. Michael and his wife Jeri assert claims against Baptist; Ulandera Robertson (registered nurse); Bradley Sumrall (physician assistant); Tyrone Rupert (nurse practitioner); United Emergency Services of Mississippi, LLC (hereinafter "United"); and Schumacher Management Services, Inc. (hereinafter "Schumacher").

On November 20, 2018, Michael and Jeri Bollwitt, who were Iowa residents, travelled to Columbus, Mississippi to visit their son for the Thanksgiving holidays. Two days later on November 22, 2018 at around 9:15 P.M., the Bollwitts presented at Baptist's emergency room with Michael complaining of jaw pain. During that visit, Jeri (on Michael's behalf) signed an admission form, which set forth various terms and conditions related to the medical care to be provided.

During his November 22, 2018 visit, Michael was treated by Bradley Sumrall. The Bollwitts describe the treatment Michael received during that visit as follows:

> After a very cursory examination, PA Sumrall noted that Michael's right tympanic membrane (inter-ear) was "injected (centrally)", i.e., red and inflamed, a clear indication of an ear infection or otitis media. Sumrall accessed a national database (knows as the "Prescription Monitoring Program" or "PMP") to ensure Michael was not "doctor shopping" for pain medication; noted in the record that "controlled substance prescriptions in the past year were found"; gave him more steroids and pain medication; diagnosed him with TMJ; and discharged him without treating the infection in his right ear.

[185] at p. 2 (emphasis omitted).

Michael was discharged from Baptist less than two hours after his initial arrival. Despite receiving this treatment, Michael alleges that he continued to experience pain which "was unrelenting and worsening." *Id*. at p. 3. The Bollwitts went back to Baptist's emergency room the next night. Jeri again signed an admission form during this visit. Tyrone Rupert treated Bollwitt during this visit.[1] The Bollwitts describe the events of that night as follows:

> Interestingly, PA Sumrall on this November 23rd evening noticed that his patient of the night before, Michael Bollwitt, had returned to the ER and was assigned to NP Rupert. Sumrall approached Rupert and informed him that he had seen Michael the previous evening in the ER, checking the PMP and he [Bollwitt] was "clear." He cautioned that he had already given Michael enough pain medication that should have managed pain related to TMJ. . . With this information, NP Rupert did not examine Michael's ear. He did not examine the mastoid. He did no blood tests. No CT scans. He did not assess Michael for dehydration. . . Rupert gave Michael an injection of pain medication, a muscle relaxer, medication for nausea, and discharged him.

*Id*. at p. 3 (internal citations omitted).

---

[1] Dr. Keith McCoy was assigned as Bollwitt's attending physician for this visit. McCoy was initially named as a Defendant in this case; however, he has been dismissed via a Stipulation of Dismissal [122].

Jeri was apparently frustrated with the decision to discharge Michael so quickly. She called Baptist again that night and, while speaking with a nurse, advised that "her husband's condition continued to deteriorate," and asked if she should bring him back to the emergency room. *Id*. at p. 5. After being placed on hold, Jeri allegedly became frustrated, hung up the phone, and made the decision that she would drive Michael back to Iowa the following morning so that he could receive the medical treatment she believed he needed.

However, when the next morning arrived, Jeri determined that Michael's condition was so bad that he would not survive the drive to Iowa. Jeri took Michael back to Baptist. When the Bollwitts arrived on the morning of the 24th, Dr. McCoy "immediately recognized that [Michael] was in an emergent condition; diagnosed otitis media, mastoiditis, acute osteomyelitis of the temporal bone, and overwhelming sepsis." *Id*. at p. 5. Michael was airlifted to Memphis, where he stayed in ICU for approximately two months.

Michael suffered a stroke, had two brain surgeries, and "is now totally disabled, neurologically and physically." *Id*. at p. 6. The Bollwitts contend that Michael's injuries and his subsequent condition could "have been avoided with timely and appropriate assessment and antibiotic therapy." *Id*.

*Summary Judgment Standard*

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at

3

trial." *Nabors v. Malone*, 2019 WL 2617240, at *1 (N.D. Miss. June 26, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Id*. (quoting *Celotex*, 477 U.S. at 323). "The nonmoving party must then 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Id*. (quoting *Celotex*, 477 U.S. at 324). Importantly, "the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)). However, "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalist arguments are not an adequate substitute for specific facts showing a genuine issue for trial." *Nabors*, 2019 WL 2617240 at *1 (citing *TIG Ins. Co. v. Sedgewick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)) (additional citations omitted).

*Analysis*

The Bollwitts' Second Amended Complaint [93] includes a myriad of claims. However, the issue presented in the present Motion [186] is a narrow one—specifically, whether Baptist is vicariously liable for the purported negligence of Bradley Sumrall and Tyrone Rupert.

To provide further context, neither Sumrall nor Rupert were Baptist employees when they treated Michael in the emergency room. Baptist had in place a contract with United, pursuant to which United provided staffing for Baptist's emergency room. Both Sumrall and Rupert were employees of Schumacher. Sumrall and Rupert were then leased to United via a separate contract

4

between Schumacher and United. And they then fulfilled United's contractual obligation to staff Baptist's emergency room.

At this juncture, the Bollwitts seek a pre-trial ruling that, despite these contractual arrangements, Baptist is nevertheless liable as a matter of law for Sumrall and Rupert's negligent conduct, if any. The Bollwitts seek such a ruling pursuant to the apparent authority principle of agency under Mississippi law.

The seminal Mississippi case on this issue is the Mississippi Supreme Court's 1985 decision in *Hardy v. Brantley*, 471 So.2d 358 (Miss. 1985). In *Hardy*, the decedent was treated at the Hinds General Hospital Emergency Room in Jackson, Mississippi. *Id*. at 360. Unbeknownst to the decedent, the medical providers who treated him were not employed by Hinds General but, rather, were independent contractors. *Id*. After the decedent passed away, the administratrix of his estate brought a medical negligence action. *Id*. at 362.

In analyzing whether the hospital could be held vicariously liable, the Mississippi Supreme Court framed the issue as follows: "We regard the question whether a hospital operating an emergency [room] may be held liable vicariously or under the theory of respondeat superior for the conduct of emergency room physicians retained by the hospital as one of first impression in this state." *Id*. at 369. The Supreme Court noted that while the hospital argued that its contracts with the physicians included certain disclaimer language, "our concern . . . regards the rights and duties of the hospital vis-à-vis the patient, not the emergency room physician." *Id*. After surveying decisions issued on this topic by various courts across other states, the Supreme Court concluded:

> Having in mind the considerations and premises set forth in the above authorities, we have concluded that the better rule to be followed in this state henceforth is this: Where a hospital holds itself out to the public as providing a given service, in this instance, emergency services, and where the patient engages the services of the hospital without regard to the identity of a particular physician

5

> and where as a matter of fact the patient is relying upon the hospital to deliver the desired heath care and treatment, the doctrine of respondeat superior applies and the hospital is vicariously liable for damages proximately resulting from the negligent, if any, of such physicians. By way of contrast and distinction, where a patient engages the services of a particular physician who then admits the patient to a hospital where the physician is on staff, the hospital is not vicariously liable for the neglect or defaults of the physician.

*Id*. at 371.

In reaching this conclusion, the Supreme Court specifically noted the inequity which would result if the hospital could escape liability by "contract[ing] away liability for the negligence of its physicians, particularly where such an agreement is beyond the knowledge or perception of the patient." *Id*.

The Mississippi Supreme Court again addressed this issue in *Gatlin v. Methodist Med. Ctr., Inc.*, 772 So.2d 1023 (Miss. 2000). In that case, Donaly Floyd Williams, Jr. was treated at Methodist Medical Center after being shot. *Id*. at 1025. Several physicians, including David Carlson (an anesthesiologist), immediately began treating Wilson, who subsequently died. *Id*. Wilson's estate brought suit against Dr. Carlson and Methodist; however, the trial court entered a directed verdict in favor of Methodist. *Id*. On appeal, the Supreme Court reversed, finding that a reasonable fact finder could have found Methodist liable under *Hardy*, considering the extensive nature of Dr. Carlson's practice at Methodist, the fact that Methodist held itself out as a provider of emergency services, and that Williams received treatment at Methodist with no regard or knowledge of the identity of any particular medical provider. *Id*. at 1030.

Although not in the medical negligence context, the Mississippi Supreme Court has recently reiterated that "[u]nder Mississippi law, apparent authority exists when a reasonably prudent person, having knowledge of the nature and the usages of the business involved, would be justified in supposing, based on the character of the duties entrusted to the agent, that the agent has

6

the power he is assumed to have." *Newsome v. Peoples Bancshares, Inc.*, 328 So.3d 87, 91 (Miss. 2021) (citations omitted); *see also Diversicare of Meridian, LLC v. Shelton*, 334 So.3d 487, 495 (Miss. Ct. App. 2022).

With that overarching standard in mind, the Court turns to the specific facts of the case *sub judice*. On both November 22 and November 23, Jeri, on Michael's behalf, signed an admission form which, in pertinent part, provided:

> II.  INDEPENDENTLY PRACTICING DOCTORS AND OTHER HEALTH CARE PROFESSIONALS
>
> A.  I understand that my admitting and consulting physician(s), radiologist(s), pathologist(s), emergency department physician(s), anesthesiologist(s), podiatrist(s), psychologist(s), allied health professionals employed by physicians or other corporations and private duty nurses (and sitters) are engaged in the practice of their professions on behalf of themselves or other corporations *and are not employees or agents of the facility*. I understand that I may receive bills for their professional services in addition to bills I receive from the facility.
>
> B.  I also understand that the facility permits various educational institutions to train medical students, interns, residents, fellows and other health care professionals at the facility. I consent to the observation and participation of all such personnel in my care. I understand and acknowledge that while these personnel practice on the facility's premises, use the facility's equipment, and are subject to the facility's administrative rules and protocols, they are NOT employees or agents of the facility. The facility is not responsible for their acts or omissions, and I will not attempt to hold the facility responsible for their acts or omissions. *If I want to know the employment status/affiliation of any health care provider, I will ask questions to satisfy myself of their status sufficient to make informed decisions regarding the employment status/affiliations of the various health care providers.*

[7] at p. 1; [9] at p. 1 (emphasis added).

Baptist also attached to its Response [198] photographs of signage regarding the employment status of physicians working at the facility. Baptist contends the signs were posted in the emergency department on November 22 and November 23. In particular, one sign stated: "Service Rendered By The ER Physicians Is Billed Separately And Will Not Be Included In Hospital Bill." [198], Ex. 2. The other sign, which appears to be in essence a piece of paper placed on one of the buildings doors, provided:

**EMERGENCY PHYSICIAN CHARGES**

> The physicians who treat the patients in the emergency department are not employed by the hospital. The physicians are independent contractors who provide medical services at a patient's request. The professional fees are for the physician's services, and are not included in your hospital bill. They are separate and apart from the fees charged by the hospital for the use of its facilities.

[198], Ex. 3.

Baptist contends that the representations made on those signs were accurate, as it "did not bill for Mr. Sumrall and Mr. Rupert nor did it collect any charges for their billings." [199] at p. 9.

On the other hand, the Bollwitts contend that the admission form must be discounted because the form "is a two-page, single spaced document that is almost unreadable by a healthy person; much less one suffering from a severe bacterial infection, otitis media, mastoiditis, and unrelenting pain." [204] at p. 3. As to his knowledge on this issue, Michael executed an affidavit indicating the following:

> 2. At no time did anyone at the Baptist ER on November 22, 2018 ever advise me in writing or verbally that my caregivers PA Sumrall and/or NP Rupert were "independent contractors" or were employees and/or agents of anyone other than Baptist. [I am unable to remember the details of November 23rd.]
>
> 3. I was never presented with (and never saw) the "Service Rendered By Physician" signage attached as Exh. 20(c) to

8

          our MPSJ. My wife has since read it to me. If I had seen it, it definitely would not have informed me that PA Sumrall and/or NP Rupert were "independent contractors" or otherwise agents of anyone other than Baptist.

4.      I was never presented with (and never saw) the "EMERGENCY PHYSICIAN CHARGES" signage attached as Exh. 3 to Baptist's Response. My wife has since read it to me. [If] I had seen it, it would not have informed me that PA Sumrall and/or NP Rupert were "independent contractors" or otherwise agents of anyone other than Baptist.

5.      To reiterate the sworn testimony in my earlier affidavit, I chose to present to the Baptist ER. My motivation and state of mind was that I would be treated by Baptist. I did not choose to present to PA Sumrall or NP Reuprt. I did not know them. I knew no one at Baptist other than my soon-to-be daughter-[i]n-law Briana Sharkey Bollwitt, who at the time was a RN assigned to the ICU at Baptist. I, like RN Sharkey and RN Robertson, assumed that anyone treating us in the Baptist ER was employed by Baptist. I had no reason to assume otherwise.

6.      It was impossible for me to read the small font "Admissions General Conditions" document signed by me on November 22nd. I was in an emergent condition. My pain was excruciating. It was not possible for me to have read that small font. . .

[204], Ex. 7 at p. 1-2.[2]

      Turning first to the admission form, both parties' arguments appear to be reasonable. On the one hand, the form did include language which could have placed the Bollwitts on notice that certain medical providers were independent contractors. Although the form did not list the specific contractual arrangement pursuant to which Baptist staffed its emergency room, it did provide information such that a reasonable person could be on notice that providers were not Baptist employees. This Court finds that point to be particularly noteworthy when considered in light of

---

[2] Jeri Bollwitt also executed an affidavit including the same contentions. *See* [204], Ex. 6.

the Mississippi Supreme Court's rationale in *Hardy* that a hospital should not be permitted to contract away liability "particularly where such an agreement is *beyond the knowledge or perception of the patient*." *Hardy*, 471 So.2d at 371 (emphasis added). In other words, the admission form, which Jeri admittedly signed on two different occasions, provided notice. This certainly cuts against the independent contractor status being completely beyond the Bollwitts' knowledge or perception. Similarly, the signs which Baptist contends were located in the emergency room provided additional notice of the lack of an employment relationship between Baptist and certain medical providers.

On the other hand, the Court is cognizant of the allegations in Michael's affidavit—particularly, that he did not read the form and that he did not see the signs Baptist contends were placed in the emergency department. However, those allegations are, by their very nature, subjective allegations as to Michael's state of mind and perception at the time. And whether his failure to notice or consider those things was reasonable is a slightly different question. The Bollwitts certainly may prevail on those arguments at trial. However, the Court's role at this stage in the proceedings is not to decide factual issues or weigh evidence but, instead, simply determine if any genuine issues of material fact exist. *See*, *e.g.*, *McManaway v. KBR, Inc.*, 852 F.3d 444, 449 (5th Cir. 2017) ("It is not the role of the court to make credibility determinations, or to weigh evidence when ruling on a motion for summary judgment.") (citation omitted).

The Court finds that these issues constitute questions of fact which should not be decided at this stage of the proceedings but, rather, should be resolved at trial. Summary judgment is therefore improper.

10

*Conclusion*

For the reasons set forth above, the Bollwitts' Motion for Partial Summary Judgment [186] is DENIED.

SO ORDERED, this the 23rd day of August, 2022.

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE